******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## T & M BUILDING CO., INC. *v.* WILLIAM HASTINGS
### (AC 38614)

Alvord, Bright and Eveleigh, Js.

*Syllabus*

The plaintiff brought this action against the defendant seeking the specific performance of a contract for the sale of certain of the defendant's real property to the plaintiff. In 2010, T, the chief executive officer of the plaintiff, and the defendant created and signed a handwritten document reflecting their intention for the defendant to sell a parcel of certain real property to T for development into residential homes. The plaintiff hired L, an engineer, to develop plans and to obtain permits from the town and other governmental agencies. Thereafter, the defendant informed L that he was concerned with the drainage system in L's plans, which extended the drainage system into a portion of the defendant's property that he was not selling. A revised drainage plan required additional governmental approvals, and without fully approved plans the plaintiff refused to close. The plaintiff subsequently instituted this action seeking specific performance and alleged claims for breach of contract, unjust enrichment and promissory estoppel as a result of the defendant's failure to transfer the property to it. The trial court found in favor of the defendant on all counts of the complaint and rendered judgment thereon, from which the plaintiff appealed to this court. *Held:*

1. The plaintiff could not prevail on its claim that the trial court erred in determining that the document executed by the parties violated the statute of frauds: that court found that the document did not identify the buyer or seller, describe the property with definiteness, or define boundaries for the property or the size of the parcel, nor did it reference maps or other documentation that would define and describe the property, and it found that a phrase indicating a "right to back out" was so lacking in context that it was itself evidence that the document did not satisfy the statute of frauds, and because the document lacked essential terms required to satisfy the statute of frauds, the court did not err in declining to utilize extrinsic evidence where, as here, such evidence was not introduced to aid in the interpretation of a valid contract, but was advanced to provide essential missing terms; moreover, the plaintiff's claim that the court improperly failed to consider its claim that part performance removed the agreement from the statute of frauds was unavailing, as the court, in finding for the defendant on the plaintiff's breach of contract claim on the ground that the document violated the statute of frauds, necessarily rejected that claim, and the court found that the plaintiff's actions could have been attributed to the risk it took in investing in L's services and, thus, did not unmistakably point to the formation of an enforceable contract, which precluded a conclusion that the plaintiff satisfied the requirements of part performance to defeat the statute of frauds.

2. The trial court did not err in rendering judgment for the defendant on the plaintiff's unjust enrichment claim, and its finding that the plaintiff did not confer any benefit on the defendant was not clearly erroneous; that court found that the defendant was not unjustly enriched by the plaintiff's decisions, including its decision to invest in L's preparation of plans containing a drainage system that the defendant opposed, and that there was no credible evidence to support the claim that the defendant received the benefit of L's plans, and those findings were supported by the record.

3. The plaintiff's claim that the trial court erred in rendering judgment for the defendant on its promissory estoppel claim was unavailing: the court did not err in concluding that the plaintiff did not suffer substantial financial injury even though it had incurred expenses, as the court found that it had incurred expenses not in reliance on a clear and definite promise that the defendant reasonably could have expected to induce reliance, but in furtherance of its choice to invest in L's services, and although the plaintiff claimed that the court erred, in its promissory

estoppel analysis, in considering the ambiguity of the document executed by the parties, the court did not invoke the provisions of the document to bar the plaintiff's claim but, rather, considered the document in the context of whether a promise, which a promisor reasonably could have expected would have induced reliance, was made.

Argued September 17—officially released November 26, 2019

*Procedural History*

Action for specific performance of a contract for the sale of certain real property, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the matter was tried to the court, *Elgo, J.*; judgment in favor of the defendant, from which the plaintiff appealed to this court. *Affirmed.*

*Brandon B. Fontaine*, with whom, on the brief, was *C. Michael Budlong*, for the appellant (plaintiff)

*Kevin M. Deneen*, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, T & M Building Co., Inc., appeals from the judgment of the trial court rendered in favor of the defendant, William Hastings. On appeal, the plaintiff claims that the court erred in (1) determining that the agreement between the plaintiff and the defendant violated the statute of frauds, (2) rendering judgment for the defendant on the plaintiff's unjust enrichment claim, and (3) rendering judgment for the defendant on the plaintiff's promissory estoppel claim. We affirm the judgment of the trial court.

The following facts, as found by the trial court or as undisputed by the parties, and procedural history are relevant to this appeal. The defendant is the owner of a 196-acre farm, on which he farms tobacco. He, along with his brother, Walter Hastings, and his sister, Marion Jellison, inherited the property in 2007. In 2009, Walter Hastings instituted a partition action. Following negotiations, the defendant purchased his brother's interest in the property, obtaining a mortgage, and also acquired his sister's portion of the property. The defendant engaged Edward Lally, a friend and engineer, to explore a possible subdivision of a portion of the land. Lally obtained a zone change for a portion of the land from agricultural to residential use and submitted a request for pre-application scrutiny. The defendant asked Lally whether he knew of anyone interested in buying a portion of his property, and Lally introduced the defendant to Steven Temkin, chief executive officer of the plaintiff.

Prior to a formal meeting, Temkin drove out to look at the property. The defendant noticed an individual on his property and introduced himself. He then invited Temkin to look over the property. A meeting was held on July 26, 2010, at Lally's office, and Temkin and the defendant created and signed a handwritten document (Exhibit 1); see appendix to this opinion; reflecting their intention for the defendant to sell a parcel of his farmland to Temkin for development into residential homes. Exhibit 1 states: "1) Subject to environmental review—seller to remediate if necessary; 2) Based on forty-six lots 20,500 each Adjust up or down Right to Back out $943,000; 3) Free & Clear title; 4) No water & Sewer assessment due; 5) Closing Jan. 5 or sixty days after approvals whichever comes first; 5) No mortgage contingency."

The plaintiff hired Lally to begin developing plans for the subdivision and to obtain permits from the town of Windsor and other governmental agencies. On September 7, 2010, shortly after Lally completed an initial draft of the plans, the defendant immediately informed Lally that he had a concern with the plans' drainage system extending into the portion of his property that he was not selling. The defendant made clear that he found drainage extending into such property unacceptable

and that he would not agree to drainage rights being extended over his remaining land. Lally immediately informed Temkin of the defendant's concerns. Lally continued to work on addressing the defendant's concerns by seeking permits to have drainage redirected to the Farmington River. Lally recommended to both parties that he continue to seek approval of the version of the plans containing the unacceptable drainage system from the Inland Wetlands and Watercourses Commission of the Town of Windsor and the Planning and Zoning Commission of the Town of Windsor, because if he was unsuccessful in obtaining the special use permits required for an open space subdivision, the drainage issue would be moot. Lally obtained such permits in October, 2010.

A revised drainage plan with drainage flowing into the Farmington River required approval from the Army Corps of Engineers and the Department of Environmental Protection. In January, 2011, the plaintiff paid the defendant a 10 percent deposit, in the amount of $94,300, which funds were held in escrow. The remaining approvals were not in place as of January, July, or December, 2011, the dates corresponding with the defendant's inquiries about closing the deal. Without fully approved plans, the plaintiff refused to close. The defendant had signed applications for extensions of the existing approval of the subdivision, the last of which he signed in December, 2011. Thereafter, he let the approval lapse and "returned the deposit . . . ."[1]

The plaintiff instituted this action against the defendant in February, 2013. In the operative complaint, it sought specific performance and alleged breach of contract arising out of the defendant's failure to transfer the property to the plaintiff. It also alleged unjust enrichment and promissory estoppel, both premised in part on the allegation that the plaintiff had spent $243,340 in engaging Lally and obtaining the regulatory approvals necessary to develop the property.[2] The matter was tried to the court. Four witnesses testified: the defendant, Lally, Temkin, and Walter Hastings. Both parties filed posttrial briefs and reply briefs.

In a memorandum of decision issued on October 5, 2015, the court found in favor of the defendant on all counts of the plaintiff's complaint. It first found that Exhibit 1 failed to satisfy the statute of frauds, on the basis that it failed to identify the buyer or seller, failed to describe the property with any degree of definiteness, and included the phrase "right to back out." (Internal quotation marks omitted.) With respect to the plaintiff's unjust enrichment claim, the court found that there was no credible evidence to support the plaintiff's claim that the defendant had received the benefit of Lally's plans. It further found that despite the defendant's concerns with respect to drainage, Temkin assumed a business risk when the plaintiff continued to invest in Lally's

services. Thus, the court rejected the unjust enrichment claim, finding that the defendant's conduct had not been inequitable or unconscionable such that he had been unjustly enriched by the plaintiff's actions. Turning to the plaintiff's promissory estoppel claim, the court again noted that the "the plaintiff chose to take the risk of investing in Lally's services and other expenses *after* the defendant made clear from the outset that he would not give drainage rights over his property, before any approvals were secured and well before the drawn out process of attempting to get approval for a revised drainage plan." (Emphasis in original.) On the basis of the ambiguity of Exhibit 1's terms, including the "right to back out" and the lack of clarity as to the subject property, the court found that the plaintiff could not recover under a theory of promissory estoppel. (Internal quotation marks omitted.) The plaintiff thereafter filed a motion to reargue, which was denied summarily. This appeal followed.[3]

I

The plaintiff's first claim on appeal is that the court erred in finding Exhibit 1 unenforceable under the statute of frauds without considering both extrinsic evidence to resolve ambiguities contained therein and the doctrine of part performance. The defendant responds that the court correctly determined that Exhibit 1 failed to meet the requirements of the statute of frauds and, in the absence of an underlying agreement, the doctrine of part performance is not applicable. We agree with the defendant.

A

Acknowledging that Exhibit 1 contains ambiguities, the plaintiff asserts that the court "should have considered the substantial extrinsic evidence in the record that could have resolved those ambiguities." We conclude that the court did not err in finding that Exhibit 1 lacked essential terms, such that it was unenforceable under the statute of frauds.

We first set forth applicable principles of law and our standard of review. General Statutes § 52-550 (a) provides in relevant part that "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ." "To comply with the statute of frauds an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof, or from a reference contained therein to some other writing or thing certain; and these essentials must at least consist of the subject of the sale, the terms of it and the parties to it, so as to furnish evidence of a complete agreement."

(Internal quotation marks omitted.) *Breen* v. *Phelps*, 186 Conn. 86, 92, 439 A.2d 1066 (1982).

"Whether a contract exists is a question of fact for the court to determine. . . . It is not within the power of this court to find facts or draw conclusions from primary facts found by the trial court. As an appellate court, we review the trial court's factual findings to ensure that they could have been found legally, logically and reasonably. . . . Thus, the trial court's factual determination that a contract existed must stand unless we conclude that it was clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Levesque Builders, Inc.* v. *Hoerle*, 49 Conn. App. 751, 754–55, 717 A.2d 252 (1998). The determination of whether a contract is sufficiently definite to satisfy the statute of frauds also is a question of fact, and "the trial court's findings in this regard must stand unless they are clearly erroneous." Id., 757.

"Appellate review under the clearly erroneous standard is a two-pronged inquiry: [W]e first determine whether there is evidence to support the finding. If not, the finding is clearly erroneous. Even if there is evidence to support it, however, a finding is clearly erroneous if in view of the evidence and pleadings in the whole record [this court] is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 755.

In order for a contract for the sale of land to satisfy the statute of frauds, it must set forth the essential terms of the contract—the purchase price, the parties, and the subject matter for sale. *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 294, 977 A.2d 189 (2009). In the present case, the court found that Exhibit 1 "does not identify the buyer or seller; it fails completely to describe the property with any degree of definiteness. It does not even identify the street, town, state or country in which the property is located. It does not define boundaries for the property, the size of the lots, the size of the parcel, nor does it reference maps or other documentation that would define and describe the property." The court further found that the "right to back out" phrase "is so lacking in adequate context that it is itself evidence that the document does not satisfy the statute of frauds." (Internal quotation marks omitted.)

We conclude that the court's findings are not clearly erroneous. Although the court found that Exhibit 1 contains the signatures of both Temkin and the defendant, neither party is identified in the document, nor is Temkin identified in relation to the plaintiff. See *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 543–44, 391 A.2d 170 (1978) (holding that contract that mentioned only limited agent and not seller failed to satisfy statute of frauds). Moreover, evidence supported a finding that Exhibit 1 is deficient with respect to the subject

matter for sale. See *Mansour* v. *Clark*, 5 Conn. Cir. Ct. 439, 440 n.1, 442, 256 A.2d 436 (1968) (writing failed to satisfy statute of frauds on basis that precise area of land was not ascertained, where writing described subject of sale as portion of land lying "generally southerly and westerly of your property"). Exhibit 1 alludes to forty-six lots, but wholly fails to identify the location or size of the lots, and it includes the phrases "adjust up or down" and "right to back out." Thus, the court's finding that Exhibit 1 fails to satisfy the statute of frauds is not clearly erroneous.

Moreover, because Exhibit 1 lacks essential terms required to satisfy the statute of frauds, we cannot conclude that the court erred in declining to utilize extrinsic evidence to add to those terms. Our Supreme Court has stated that "[i]n order to be in compliance with the statute of frauds . . . an agreement must state the contract with such certainty *that its essentials can be known from the memorandum itself, without the aid of parol proof* . . . . The statute of frauds is also satisfied [when] the contract or memorandum contains by reference some other writing or thing certain." (Citation omitted; emphasis added; internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, supra, 293 Conn. 294; see also *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, supra, 174 Conn. 543–44 (written memoranda were "not sufficient in themselves and made no reference to any other writing or thing certain to provide the missing essentials"); *Gabriele* v. *Brino*, 85 Conn. App. 503, 509, 858 A.2d 273 (2004) ("[a]lthough under certain circumstances, the court may read documents together to satisfy the statute of frauds . . . the multiple writings still must state the essential terms of the contract without the use of parol proof" [citation omitted]); cf. *Lynch* v. *Davis*, 181 Conn. 434, 441 n.5, 435 A.2d 977 (1980) ("[a] memorandum under the Statute of Frauds, because it serves a purpose different than that of an integrated writing invoking the parol evidence rule,[4] does not exclude the introduction of consistent *additional nonessential* parol terms" [emphasis added; footnote added]). The court in the present case found Exhibit 1 deficient as to its essential terms, and found that it lacked reference to any other document. Thus, the court was not required to consider parol evidence to correct deficiencies in the essential terms of the agreement.

On appeal, the plaintiff relies on *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 735, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996), in support of its claim that Exhibit 1, when considered in light of extrinsic evidence, is sufficient to satisfy the statute of frauds. In *Foley*, the plaintiff entered into a contract with the defendants for the purchase of a nursing home. Id., 715. Although the nursing home was located on a 10.09 acre tract of land, the contract provided for the sale of 3.74 acres of land, which had been proposed by a surveyor

in furtherance of the plaintiff's intention to purchase enough land to operate the nursing home. Id., 715–16. Prior to the closing date, it was discovered that the 3.74 acre tract of land, which the nursing home would occupy after the sale, would violate the town of Fairfield's zoning requirements. Id., 716. The defendants rejected several solutions proposed by the plaintiff to avoid the zoning violation and the defendants ultimately failed to apply for a variance in violation of a court order to do so. Id., 716–17. The plaintiff filed suit alleging, among other causes of action, breach of contract. Id., 718. Following a jury verdict in the plaintiff's favor on his breach of contract claim, the trial court granted the defendants' motion to set aside the jury award. Id., 722–23.

On appeal, the plaintiff in *Foley* argued that the trial court improperly set aside the verdict because there was sufficient evidence to establish that the defendants had breached their promise to convey enough land to operate a nursing home. Id., 726. The parties' arguments concerned whether the defendants were obligated to sell only 3.74 acres and the nursing home building or whether they were obligated to sell additional land to make the nursing home operable. Id., 729. This court concluded that the construction of the contract was a question of fact for the jury and that the jury could have concluded that the contract was "one for the sale of land on which a nursing home business could be conducted." Id. In so concluding, the court looked to various contract terms that supported a jury finding that the parties intended to sell an operable nursing home, including that the contract provided for the sale of certain assets necessary for operating the business, including employee information and certain licenses, and that the seller agreed to "comply with all regulatory agencies' requirements regarding change of ownership to allow the Buyer to obtain all necessary licenses, Medicaid and Medicare rates and other necessary requirements." (Internal quotation marks omitted.) Id., 731–32. This court also looked to extrinsic evidence in the record of the parties' intent, rejecting the defendants' argument that the introduction of such evidence had violated the parol evidence rule.[5] Id., 732–33. This court concluded that the challenged evidence was not used to vary the terms of the contract, but rather to aid in the interpretation of the contract and to determine the intent of the parties. Id., 734.

The defendant next argued that the additional obligation of "enough land to operate a nursing home" constituted an oral contract that was unenforceable in violation of the statute of frauds. (Internal quotation marks omitted.) Id., 729, 735. This court explained that "[t]he statute of frauds was not violated because a written contract to sell land existed, and the evidence admitted was used properly to discern the intent of the parties." Id., 736. It reasoned that although "the addendum

clearly described the sale of 3.74 acres along with the buildings on said acres, the contract language indicates that the sale was of a nursing home, which is more than the sale of a building. Whether the parties intended to contract for the sale of a building on 3.74 acres or the sale of an operable nursing home is a question of fact, which properly was submitted to the jury." Id., 729. Because the extrinsic evidence in *Foley* was admitted to discern the intent of the parties to a valid written contract, we find *Foley* distinguishable. In the present case, the extrinsic evidence advanced by the plaintiff was not introduced to aid in the interpretation of a valid contract formed between the parties, but, rather, it was advanced to provide essential terms that were missing from Exhibit 1.[6]

B

The plaintiff next argues that the court failed to consider its claim that part performance removed the contract from the statute of frauds. In the alternative, it argues that "if this court holds that the trial court did conduct that analysis, then the plaintiff asserts that the trial court's silent finding that part performance did not apply was clearly erroneous." The defendant responds that "there was no meeting of the minds in regards to essential contract terms between the parties here, and therefore, part performance cannot apply." We agree with the defendant.

We first set forth general principles of law and our standard of review. "[W]hen estoppel is applied to bar a party from asserting the statute of frauds . . . we . . . require that the party seeking to avoid the statute must demonstrate acts that constitute part performance of the contract. . . . Specifically, [t]he acts of part performance . . . must be such as are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties. . . . The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute. . . .

"Thus . . . the elements required for part performance are: (1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract. . . . Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. . . . First, part performance satisfies the evidentiary function of the statute of frauds by providing proof of the contract itself. . . . Second, the inducement of reliance on the oral agreement implicates the equitable principle under-

lying estoppel because repudiation of the contract by the other party would amount to the perpetration of a fraud." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, supra, 293 Conn. 295–96. Our review of a court's determination as to whether a party has demonstrated part performance of a contract is governed by the clearly erroneous standard of review. *Patrowicz* v. *Peloquin*, 190 Conn. App. 124, 139, 209 A.3d 1233, cert. denied, 333 Conn. 915,    A.3d (2019); *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 826, 3 A.3d 992 (2010).

As a preliminary matter, we note that although the court did not expressly reject the plaintiff's part performance argument, it found for the defendant on the plaintiff's breach of contract claim on the basis that Exhibit 1 failed to satisfy the statute of frauds. Thus, the court necessarily rejected the plaintiff's argument that part performance removed the agreement from the statute of frauds. Moreover, the court found that the plaintiff's actions could have been attributed to its choice to take a risk in investing in Lally's services, and, thus, its actions do not unmistakably point to a contract. This finding precludes a conclusion that the plaintiff satisfied the requirements of part performance to defeat the statute of frauds.

Our Supreme Court has stated the principle that, in the absence of a meeting of the minds, there can be no part performance that removes the agreement from the statute of frauds. *SS-II, LLC* v. *Bridge Street Associates*, supra, 293 Conn. 301; *Montanaro Bros. Builders, Inc.* v. *Snow*, 190 Conn. 481, 487, 460 A.2d 1297 (1983). This is because "the doctrine of part performance requires conduct that is referable to and consistent with [an] oral agreement between the parties. In the absence of an underlying agreement, there is no basis for finding that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, supra, 298.

In *SS-II, LLC*, our Supreme Court concluded that part performance did not apply where there was no meeting of the minds as to the purchase price in an option to purchase, in part because "[a]lthough the option to purchase provides that the purchase price of the property shall be $1.2 million, subject to certain adjustments that are to be calculated by a formula pertaining to when the option is exercised, it also provides that the price will be further adjusted to take into account environmental conditions existing at the leased premises, which adjustment *shall be mutually determined* by Lessor and Lessee." (Emphasis in original; internal quotation marks omitted.) Id., 299. The court

reasoned that "[a] mere statement that the parties will mutually determine the future purchase prices does not mean that the parties will, in fact, agree," and "there is no provision in the statute of frauds protecting the plaintiff in the event that the parties are unable to agree or the defendant refuses to sell . . . ." Id., 300–301. Because "the option to purchase did not guarantee that the plaintiff would be able to purchase the property but simply constituted an agreement to agree," there was no meeting of the minds and could be no part performance that removed the option to purchase from the statute of frauds. Id., 301.

In the present case, the court found the "right to back out" language, among other deficiencies, rendered Exhibit 1 insufficient to satisfy the statute of frauds. (Internal quotation marks omitted.) The court's finding that there was no enforceable contract, based partly on the "right to back out," was supported by the testimony at trial. (Internal quotation marks omitted.) Temkin testified that the right to back out was there "in the event that, you know, we got two lots or something," and he agreed that Exhibit 1 did not indicate that the right to back out was solely his right.[7] The defendant testified that the "right to back out" meant that "at any time either party could cancel this contract . . . for any purpose."[8] As in *SS-II, LLC*, Exhibit 1 did not guarantee that the plaintiff would be able to purchase the property, and, thus, in the absence of a meeting of the minds, the plaintiff could not avoid the statute of frauds under a theory of part performance. See *Montanaro Bros. Builders, Inc.* v. *Snow*, supra, 190 Conn. 487 (plaintiffs could not rely on theory of part performance where trial court found that minds never met on which six acres were to be excluded from sale, "a factual finding negating the presence of either an oral or a written contract").

Moreover, the acts claimed by the plaintiff to constitute part performance are not of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of an enforceable contract. The court found that "the plaintiff chose to take the risk of investing in Lally's services and other expenses *after* the defendant made clear from the outset that he would not give drainage rights over his property, before any approvals were secured and well before the drawn out process of attempting to get approval for a revised drainage plan." (Emphasis in original.)

This finding illustrates the risk that the plaintiff accepted in investing in Lally's services while continuing to seek approval of a drainage plan acceptable to both the governmental agencies and the defendant.[9] Thus, we conclude that the plaintiff's acts do not "compel the inference that there was some contract by which these acts were required of the plaintiff[s] and therefore

explainable upon no other theory"; (internal quotation marks omitted) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 67, 873 A.2d 929 (2005); and, thus, the court's rejection of the plaintiff's part performance argument was not improper.

Accordingly, the plaintiff failed to prove that it had an enforceable contract.[10]

II

The plaintiff's second claim on appeal is that "[t]he court erred when deciding the plaintiff's unjust enrichment claim by finding that the plaintiff did not confer any benefit on the defendant." Specifically, it argues that the defendant was benefited in that he owns the final set of plans, for which the defendant paid "a small amount," because "they were built upon the foundation of the nearly $250,000 worth of work that the plaintiff paid for beforehand." It further argues that the plans accommodating the defendant's preferred drainage system remain on file with the town of Windsor and that "little effort would be required on the defendant's part to reinitiate the subdivision process." Thus, the plaintiff argues that its work has "removed the risk for future developers and substantially enhanced the land's value and marketability for the defendant." The defendant responds that the plaintiff failed to meet its burden of producing evidence to show an increase in value to the defendant and "has failed to point to any evidence indicating exactly how much it has 'positively impacted the value' of the defendant's property as a result of its actions."

We first set forth general principles of law and our standard of review. "Under well established Connecticut law, [p]laintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. . . . Furthermore, the determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings for the trial court that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Utzler* v. *Braca*, 115 Conn. App. 261, 267–68, 972 A.2d 743 (2009).

The plaintiff relies primarily on *Gardner* v. *Pilato*, 68 Conn. App. 448, 449, 791 A.2d 707, cert. denied, 260 Conn. 908, 795 A.2d 544 (2002), to support its position. In that case, the plaintiff, a surveyor, surveyed the defendants' property and made a topographical map at

the direction of an engineer hired by the defendants to advise them on developing a piece of property. Id., 449. The defendants then refused to pay the plaintiff and, instead, hired another surveyor to do the same work. Id. The second surveyor used the plaintiff's work and an old survey that the defendants had in their possession. Id., 449–50. The trial court accepted the fact finder's[11] finding that the defendants were unjustly enriched for the full amount of the plaintiff's bill. Id., 450–51. On appeal, this court affirmed, rejecting the defendants' argument that the benefit was required to be measured only by an increase in value to the defendants' property as a direct result of the plaintiff's work. Id., 453. The court stated that "[a]lthough the defendants are correct that the damages in an unjust enrichment case are *ordinarily* not the loss to the plaintiff but the benefit to the defendant, a fact finder may rely on the plaintiff's bill when the benefit is too difficult to determine otherwise." (Emphasis in original; internal quotation marks omitted.) Id., 454.

Unlike *Gardner*, the present case does not involve a situation in which the court determined that the defendant received a benefit and that benefit was too difficult to determine. Rather, in this case, the court found that the defendant was not unjustly enriched by the plaintiff's decisions, including the plaintiff's decision to invest in Lally's preparation of plans containing a drainage system that the court found the defendant to have "vociferously and consistently opposed . . . ."[12] Moreover, the court found that "[t]here is no credible evidence . . . to support the claim that the defendant has received the benefit of [Lally's] plans." This finding is supported by testimony of the defendant that he has not attempted to sell the land to anyone other than the plaintiff, he does not intend to sell the land, and he has entered into a contract to lease a portion of the land for five years, with four, five-year options, for a total of twenty-five years, for a cell tower. Although Lally testified that the defendant told him in December, 2011, that he was "going to do the subdivision but not now and not with T & M," the defendant testified that he made that statement "[o]ut of frustration." On the basis of this evidence, we cannot conclude that the court's finding that the defendant was not benefited is clearly erroneous.

### III

The plaintiff's final claim on appeal is that the court erred in ruling in favor of the defendant on the plaintiff's promissory estoppel claim. We disagree.[13]

The following legal principles govern our analysis of the plaintiff's claim. "[U]nder the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if

injustice can be avoided only by enforcement of the promise. . . . A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all. . . .

"Additionally, the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future. . . . [A] mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance . . . and, therefore, is not sufficiently promissory. The requirements of clarity and definiteness are the determinative factors in deciding whether the statements are indeed expressions of commitment as opposed to expressions of intention, hope, desire or opinion. . . . Finally, whether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." (Citations omitted; internal quotation marks omitted.) *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 104–106, 837 A.2d 736 (2003). "[A] promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987).

In support of its argument that the court improperly rejected its promissory estoppel claim, the plaintiff argues that the court erred in concluding that the plaintiff did not suffer substantial financial injury, even though it incurred over $250,000 in expenses related to its acquisition of the defendant's property. The court found, however, that the plaintiff did not suffer such injury "when the defendant allegedly 'subsequently and unexpectedly' reneged on his promises." The court did not ignore the sums expended by the plaintiff. Rather, it found that the plaintiff had spent that money not in reliance on a clear and definite promise that the defendant could reasonably have expected to induce reliance, but in furtherance of its choice to "take the risk of investing in Lally's services . . . ." Specifically, the court stated: "Given the principles of equity underlying promissory estoppel, the ambiguity of the document's terms, including but not limited to the provision that there was a 'right to back out' as well as the indefiniteness of the subject property itself, this court cannot find that the plaintiff is entitled to specific performance and money damages based on the theory of promissory estoppel."[14]

The plaintiff argues that the court erred in considering the ambiguity of Exhibit 1's terms in its promissory

estoppel analysis, maintaining that the purpose of the doctrine of promissory estoppel is to permit recovery where a promise is not enforceable under the law of contract. In support of this argument, the plaintiff cites *Montanaro Bros. Builders, Inc.* v. *Snow*, supra, 190 Conn. 483, 489, in which the defendant landowner argued that the plaintiff's claim for restitution was barred by a provision of an unenforceable option contract. Specifically, the defendants argued in *Montanaro Bros. Builders, Inc.*, that because the option contract provided for the defendant to retain payments made by the plaintiff if the option was not exercised, the plaintiff could not recover those payments under a theory of unjust enrichment. Id., 489. The court stated: "Having previously relied upon the unenforceability of the option agreement to defeat the plaintiffs' claim for specific performance, the defendants cannot now invoke the provisions of that unenforceable agreement as an absolute bar to the plaintiffs' claim of unjust enrichment." Id. In the present case, however, the provisions of Exhibit 1 were not invoked to bar the plaintiff's claim. Rather, the court considered the provisions of Exhibit 1 in the context of whether a clear and definite promise, which a promisor reasonably could have expected to induce reliance, was made.

Applying the foregoing principles to the facts reasonably found by the court, we conclude that the court did not err when it rejected the plaintiff's promissory estoppel claim.

The judgment is affirmed.

In this opinion the other judges concurred.

Exhibit 1

July 26 2010

① SUBJECT to environmental review —
Seller to remediate if necessary

② BASED ON 46 lots    20,500 each
Adjust up or down        $943,000
Right to BACK out

③ Free + clear title

④ No water + sewer assessments due

⑤ closing
Jan 5 or 60 days after approvals
(whichever comes first.

⑤ No mortgage contingency

PLAINTIFF'S
EXHIBIT
T+M
Building
Hastings
FULL
NO. 13603 9637

[1] The plaintiff states in its appellate brief that any claims regarding the deposit were resolved by the parties shortly after the court rendered judgment and that the deposit is not at issue on appeal.

[2] The plaintiff also alleged that the defendant violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (CUTPA). The court rendered judgment in favor of the defendant on this count, and the plaintiff does not challenge this ruling on appeal.

[3] Thereafter, the plaintiff filed a motion for articulation, which was denied, and a motion for review of that denial, which was granted in part. The court issued an articulation on October 31, 2017, in which it stated that it "denies the motion for reargument and reconsideration because it does not find that the plaintiff asserts claims which this court did not sufficiently address in the first instance in its memorandum of decision nor does it find that the plaintiff has raised issues which would have controlling effect on this court's ultimate findings or conclusions of law." The court also addressed one issue regarding the return of the deposit, which is not at issue on appeal. The plaintiff filed a motion for review of the articulation. This court granted review, but denied the relief requested.

[4] The parol evidence rule "prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract." (Internal quotation marks omitted.) *Leonetti* v. *MacDermid, Inc.*, 310 Conn. 195, 211, 76 A.3d 168 (2013).

[5] There was evidence that the defendants had entered into the contract to take advantage of a "soon to change" federal law, but later wanted to avoid the contract because they began negotiating a new sale with a new buyer within one week after signing the contract at issue; had experience in the law of real estate and zoning; hired a surveyor and created a lot in violation of the zoning regulations, which caused the nursing home to be inoperable on the acreage of 3.74 acres; refused to remedy the nonconformity

by conveying more land sufficient for an operable nursing home; and had delayed fulfilling their obligations to supply notice to the state of Connecticut Department of Public Health and a list of the current employees to the plaintiff, without which the plaintiff could not receive the necessary license approval. *Foley* v. *Huntington Co.*, supra, 42 Conn. App. 732–33.

[6] The plaintiff also relies on *Levesque Builders, Inc.* v. *Hoerle*, supra, 49 Conn. App. 754–55. In that case, a written contract provided for the sale of a thirty-six acre parcel and referenced a map indicating the location of the property. Id., 752–53. The parties signed a second written contract, which referenced a nonexistent map. Id., 753. The trial court found the contract sufficient to satisfy the statute of frauds and stated that the description of the thirty-six "plus or minus" acres was made sufficiently definite through reference to the two written contracts, the map referenced in the first contract, other maps and descriptions, and the testimony at trial. Id., 757. This court concluded that the trial court's finding that the contract satisfied the statute of frauds was not clearly erroneous. Id.

*Levesque Builders, Inc.*, is distinguishable from the present case. There, the subject of the sale, an essential term, was contained in the two writings and referenced map, such that the description of the land could be made certain through reference to extrinsic evidence. Id. Here, the subject of the sale cannot be known from the writing itself, which does not reference any map, and the court did not err in refusing to consider extraneous evidence to supply the details.

[7] On direct examination, the following exchange occurred between Attorney Budlong and Temkin:

"Q. So you would pay him more if there were more lots, less if there were less lots. Is that . . . correct?

"A. Yeah. And then in the event that, you know, we got two lots or something there's a clause, you know, they had—there was a right to back out.

"Ed Lally had done quite a bit of preliminary work, I believe, to lead both of us to think forty-six was a pretty good chance of getting close to that figure. You know it wasn't like a pig in a poke. It might be two. It might be six hundred or something like that.

"Q. Right. The right to back out had to do with if he only had two lots or three lots it wouldn't be fair—

\* \* \*

"Q. Explain that to me, the—

"A. Seeing the way the clause is written in the number two paragraph about right to back out, I'm thinking that that was—could have been what we meant. Just listen, Mr. Hastings, we're not looking to, you know, get one building lot from you and pay you [$20,500] and have all this acreage and build one house."

On cross-examination, the following exchange occurred between Attorney Deneen and Temkin:

"Q. And so when you wrote, right to back out, does that indicate that it was solely your right to back out?

"A. I believe if the lot yield was like five lots and he thought—

"Q. Well, again—

"A. —it wasn't—

"Q. —again—

"A. —enough to make it—

"Q. —this is a—

"A. —worth it he could back out.

"Q. Again, let me ask the question. Does it—this piece indicate that the right to back out is solely your right?

"A. No."

[8] On direct examination, the following exchange occurred between Attorney Budlong and the defendant:

"Q. Right. And it says, Adjust up or down. Right?

"A. Yes.

"Q. And—and then it says, Right to back out.

"A. Right.

"Q. That relates to the forty-six lots, in other words, if you could only get ten lots out of there you weren't go[ing] to sell ten lots for [$20,500], were you?

"A. Correct.

"Q. All right. And—so it was a per lot price so that if the forty-six lots couldn't be accomplished either one of you had the right to back out. Right?

"A. Or any other number of lots we had the right to back out at any time.

"Q. Well, tell me how—why it says that—that occurs? I mean it's clear that that right to back out is in provision two—

"A. Yeah.

"Q. —and it has—and you have a $943,000 figure, and that the reason that provision was there, obviously, was if you didn't get—someone didn't get forty-six thousand lots or forty-six lots you, certainly, weren't going to sell it for ten times [$20,000].

* * *

"A. My—my interpretation would be . . . that as of this right to back out included at any time either party could cancel this contract.

"Q. For any purpose.

"A. For any purpose.

"Q. Okay. The fact that it was in that paragraph doesn't mean anything to you.

"A. No."

[9] The plaintiff claims on appeal that it was clearly erroneous for the court to place emphasis and weight on the defendant's drainage concerns. We disagree that the court was not permitted to consider the drainage concerns because they had been resolved at the time of the defendant's alleged breach. Although Lally's plans had been revised to accommodate the defendant's drainage concerns, as of December, 2011, necessary permits from the Army Corps of Engineers and the Department of Environmental Protection were still outstanding. The defendant testified that he wanted to close the deal but "[t]he same questions—the—the same idea was then presented that I wanted to close this thing and that [Temkin] did not—[Temkin] told me he did not have the Army Corps of Engineers permits or the [Department of Environmental Protection] permits to do it. . . . At that point I—no other— no other engineering had been done on the site, and I threw up my hands and said this is never going to happen out of just plain frustration of having gone through this for well over a year, and I had to get on with my crops and—and figure out what crop I was going to put here, how I was going to best utilize this plan because at this rate this project was never going to happen."

[10] In light of this conclusion, the plaintiff's argument that "the court's suggestion that the plaintiff could have stopped the project at any time after September 7, 2010, ignores the legal reality that the plaintiff would have been in breach of the deal with the defendant if he did that," is unavailing. (Emphasis omitted.)

[11] The plaintiff's action was heard before an attorney fact finder. *Gardner* v. *Pilato*, supra, 68 Conn. App. 450.

[12] The court found that the defendant's conduct was not inequitable or unconscionable such that he had "been unjustly enriched by the plaintiff's decisions . . . ." Again, the court cited the defendant's concerns with respect to drainage, which it found "reasonable and not insignificant." The court stated: "Notwithstanding these concerns, Temkin, a highly successful and sophisticated businessman, was clearly highly motivated to develop and invest in this potentially lucrative parcel of property by investing in Lally's services. The fact that the plaintiff paid [Lally] to continue efforts to acquire the variety of approvals needed, with no guarantee that those approvals would be secured, was a business risk he willingly undertook."

[13] We note that our Supreme Court has not addressed "whether promises that otherwise would be subject to the requirements of the statute of frauds may be enforced on promissory estoppel grounds in the absence of compliance with the statute of frauds; see 1 Restatement (Second), supra, § 139 . . . ." See *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 89–90 n.38 (declining to address issue where neither party had raised or briefed issue); *McClancy* v. *Bank of America, N.A.*, 176 Conn. App. 408, 415, 168 A.3d 658 (holding that even if promissory estoppel exception to statute of frauds exists, plaintiff failed to provide evidence of promise claimed to have been made), cert. denied, 327 Conn. 975, 174 A.3d 975 (2017). For purposes of our analysis, we assume without deciding that a promise may be enforced on promissory estoppel grounds in the absence of compliance with the statute of frauds.

[14] The plaintiff argues that even if the court properly found that the plaintiff's actions following the defendant's raising his drainage concerns were a risk taken by the plaintiff, it "still should be entitled to reimbursement for the expenses incurred *before* the defendant raised the drainage issue . . . . The court only addressed the 'after' period in its decision, even emphasizing the word. Since the court found an initial promise from July 26, 2010, and that initial promise was never in dispute among the parties, the cutoff date for the plaintiff's right of recovery for damages incurred by reliance

on [the] promise could not have ceased any earlier than September 7, 2010." (Emphasis in original.)

We disagree that the court "found an initial promise" requiring application of the doctrine of promissory estoppel. The court noted that Exhibit 1 "was produced as a result of an *initial discussion* between the defendant and Temkin on July 27, 2010, reflecting their intention for [William] Hastings to sell a parcel of his farmland to Temkin for development into residential homes." (Emphasis added.) The recognition of an intention for the defendant to sell a parcel of his land does not constitute a finding of a "clear and definite promise" for purposes of the doctrine of promissory estoppel. See *Stewart* v. *Cendant Mobility Services Corp.*, supra, 267 Conn. 105–106 ("[t]he requirements of clarity and definiteness are the determinative factors in deciding whether the statements are indeed expressions of commitment as opposed to expressions of intention, hope, desire or opinion").

———————————————